SINNISSIPPI APARTMENTS, INC., Plaintiff-Appellant, *v.* WILLIS HUBBARD, Defendant-Appellee.

Second District   No. 82—513

Opinion filed April 20, 1983.

Steven E. Sproul, James D. Zeglis, and Mark W. Boswell, all of Reno, Zahm, Folgate, Lindberg & Powell, of Rockford, for appellant.

Bradley T. Koch, of Holmstrom and Green, of Rockford, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The plaintiff, Sinnissippi Apartments, Inc., appeals from an order of the circuit court of Winnebago County which entered a judgment against it and in favor of the defendant, Willis Hubbard, on plaintiff's small claims complaint. Plaintiff, a corporation organized to operate a cooperative apartment complex, had filed a complaint requesting recovery of $2,500 due to defendant's alleged failure to pay maintenance charges, interest, accounting and litigation expenses relating to the unit in plaintiff's complex of which the defendant is a shareholder-tenant.

On appeal, the plaintiff contends that the judgment of the trial court was contrary to the manifest weight of the evidence.

Prior to trial, the parties entered into a stipulation of many of the key facts surrounding their dispute. It was stipulated that plaintiff is a corporation organized under Illinois law and is in the business of operating a cooperative apartment. The defendant is a tenant in the apartment complex and executed a lease agreement with the plaintiff. The plaintiff's tenants are assessed maintenance charges for the use of each apartment, and those charges are determined pursuant to the term and conditions of the lease agreement. Moreover, as a prerequisite for the occupancy of a residential unit in plaintiff's complex, the defendant was required to become a shareholder in plaintiff's corporation. During the defendant's tenancy, he constructed at his own expense (a cost of $32,437) an elevator for the sole and exclusive use of his apartment. As a result of the defendant's having made that construction, plaintiff's board of directors on June 24, 1981, issued the defendant an additional 175 shares of stock in the plaintiff corporation. This issuance of additional shares was authorized by pertinent provisions of the Business Corporation Act (Ill. Rev. Stat. 1981, ch. 32, par. 157.1 et seq.), the articles of incorporation and bylaws of

plaintiff corporation and the lease agreement between the parties, subject to the requirement that such issuance be reasonable. No other additional shares had been issued to defendant by plaintiff since January 1978.

The trial court also heard the testimony of several witnesses concerning the controversy between the parties. Thelma Frary, plaintiff's secretary-treasurer, testified that the issuance of the 175 shares of stock to defendant had increased his shareholdings from 440 shares to 615 shares, and that each of plaintiff's shareholder-tenants was assessed a maintenance fee according to the number of shares which the tenant owned. The current assessment was 78 cents per share per month. Susan Kaltenbach, an employee of plaintiff's accounting firm, testified that defendant was $1,505.40 in arrears on payments of assessed maintenance fees, which arrearage resulted primarily from defendant's nonpayment of that portion of the monthly fee attributable to the extra 175 shares.

The trial court also heard the testimony of Harold Omark, an appraiser in the assessor's office, who testified on defendant's behalf. Mr. Omark had assessed the Sinnissippi Apartments in conjunction with the 1979 quadrennial reassessment and had increased the assessment of the complex by 10%. He had not considered the elevator previously constructed by defendant at all in computing his reassessment. Norris K. Levis, a real estate broker, estimated that only $5,000 of the $144,000 fair market value of defendant's building could be attributed to the installation of the elevator, and that this was a type of improvement for which the cost of construction did not result in an equivalent increase in market value.

The defendant testified that construction began on the elevator in 1978 and was finished in 1979, and that he had subsequently paid for all of its maintenance and operating expenses. He had written plaintiff's board of directors on January 9, 1981, offering to accept 50 shares of stock due to the elevator's construction. Defendant felt he should be issued some additional stock because of the elevator, but regarded 175 shares as an excessive number. On cross-examination, defendant acknowledged that after he had added a room to his apartment in 1965, he had accepted an issue of 20 additional shares. He maintained, however, that he had calculated at the time that his improvement had in fact caused an increase in plaintiff's taxes, which the resultant increase in his maintenance fee would fairly offset. He further acknowledged knowing prior to installing the elevator that he was going to have to take additional shares. However, he viewed the decision of plaintiff's board as to the number of shares to be issued to

him as arbitrary.

Mrs. Frary, recalled as a witness for the defense, said that her feeling was that the increase in the quadrennial reassessment of plaintiff's property did not in any way contribute to the decision to increase the number of defendant's shares.

Owen Harding, president of plaintiff's board, testified in rebuttal that the decision to increase defendant's shareholding was considered at approximately 10 directors' meetings and was taken only after the board consulted both its accountant and its legal advisor. He denied that the board's decision had been motivated by malice or bad faith.

John Conrad, one of plaintiff's shareholders, explained that he had developed a formula for determining the value of each share of plaintiff's stock, which valuation was a factor of 29 areas of concern. Application of this formula resulted in a determination that plaintiff's stock should be valued at $183 per share. Use of this figure resulted in plaintiff's decision that defendant's expenditure of approximately $32,500 for the construction of the elevator should result in the issuance to defendant of an additional 175 shares. The predominant factor in his formula for evaluating plaintiff's shares was their fair market value, but Mr. Conrad did not know whether installation of the elevator had in fact caused a $32,500 increase in the fair market value of defendant's apartment.

In a letter of opinion, the trial court rejected the notion that the valuation placed on the stock by the directors was conclusive if made in good faith and not as the result of fraud. The court noted that some assessment might well be justified, but denied "the plaintiff's claim for 175 additional shares and [left] it to the parties to determine a reasonable assessment."

The court subsequently signed a written order in which it concluded that article II, section 1 of defendant's lease agreement with the plaintiff, which provides for plaintiff to levy an assessment for the necessary expenses, upkeep, maintenance and operation costs, afforded plaintiff the authority to issue additional shares to defendant. Moreover, special assessments would be enforced if reasonable and based upon unambiguous lease terms which were consistently enforced and applied. However, the court held that plaintiff had not introduced sufficient evidence to establish that the issuance to defendant of 175 additional shares was directly related to the necessary expenses, upkeep, maintenance and operation of the apartment complex. The court further held that issuance of the shares was unrelated to these items. Accordingly, the trial court found that issuance of the additional shares was unreasonable and unauthorized under the cir-

cumstances of the case. The court therefore issued judgment in favor of the defendant.

Plaintiff, contending that the judgment of the trial court is against the manifest weight of the evidence, urges that this case is one presenting the question of whether, in the absence of fraud, it is a matter for a corporation's board of directors to determine the value of its shares. In reliance upon both statutory and case authority (Ill. Rev. Stat. 1981, ch. 32, pars. 157.17, 157.18; *Elward v. Peabody Coal Co.* (1956), 9 Ill. App. 2d 234), plaintiff answers this question in the affirmative. Further, assuming that the number of shares issued by the directors in exchange for defendant's contribution to plaintiff of a capital asset must be shown to be reasonable, plaintiff asserts that its use of the amount paid for the elevator as a basis for calculating that number must be considered reasonable under the circumstances. Finally, plaintiff attacks as illogical the statement in the trial court's letter of opinion (not repeated in the judgment order) that, while the plaintiff might well be entitled to an additional assessment to be determined by the parties, judgment was to be entered against plaintiff as to the entirety of its claim.

In response, defendant maintains that the issuance of additional shares here at issue amounts to an attempt by plaintiff's board of directors to make a unilateral amendment of article II, paragraph 1 of the parties' "Shareholder's Proprietary Lease." That paragraph concerns the computation of each tenant's assessment for the complex' maintenance charges and provides that the total assessment voted by the board of directors be prorated among the tenants according to the number of shares in the corporation held by each. Defendant takes the view that the directors' decision to increase his shareholdings over his protest was an invalid attempt to amend the lease unilaterally (citing *Carden Hall, Inc. v. George* (1968), 56 Misc. 2d 865, 290 N.Y.S.2d 430, and *Tompkins v. Hale* (1939), 172 Misc. 1071, 15 N.Y.S.2d 854).

Similarly, defendant claims that the board's action may be viewed as an attempt to increase his rent, done without regard to the requirements of article XII, section 1 of plaintiff's bylaws.

Finally, defendant concludes that plaintiff failed to establish any basis upon which his shareholdings could be increased, given that he bears the entire cost of the operation and maintenance of the elevator and that construction of the elevator did not result in an increase in the assessed value of plaintiff's property and caused only a $5,000 increase in its appraised fair market value. The defendant views the board's action as making him responsible for paying virtually the entire amount of increase in the apartment complex' real estate taxes,

despite testimony that the newly constructed elevator was not a factor resulting in that increase.

Three types of cooperative apartments are described in 1 American Law of Property sec. 3.10, at 199-200 (1952), which contains the following discussion of the most prevalently employed type, which involves corporate ownership of the apartment complex:

> "Shares of stock *** are sold to persons who will occupy the housing units, the number of shares *** depending on the value of the particular apartment or unit. 'Proprietary' leases are issued by the corporation to the shareholders. These leases contain provisions common to other leases. *** Rent, which is subject to being increased or decreased, is based upon estimates of amounts necessary to pay operational costs and interest and installments of principal on any capital indebtedness. Other provisions include covenants against assignment without the consent of the board of directors of the corporation, that the tenant will make inside repairs but no structural changes, and that the corporation may forfeit the lease for breach of various of the covenants or violation of the rules of conduct established by the corporation.
>
> * * *
>
> It would seem clear that the lease in the usual cooperative apartment organization creates the relation of landlord and tenant between the corporation and the shareholder-occupant. Of course, the purpose of the organization is to approach individual home ownership as nearly as is possible in a situation where the only practical solution is common operation and management of many features, and the number of the occupant's shares are determined by the value of the apartment he occupies. But in legal theory the corporation is distinct from its shareholders, no one of whom has a right to receive legal title to any specific property of the corporation under the better-drawn plans, and it is necessary that this distinction be observed in order to carry out the purposes of the cooperative. The courts have recognized that the relation is that of landlord and tenant in allowing the corporation the usual remedies of a landlord against a tenant."

See generally *Gale v. York Center Community Cooperative, Inc.* (1960), 21 Ill. 2d 86; *Logan v. 3750 North Lake Shore Drive, Inc.* (1974), 17 Ill. App. 3d 584; *Brothers v. McMahon* (1953), 351 Ill. App. 321; *Kenny v. Thompson* (1949), 338 Ill. App. 403.

Moreover, "a cooperative is somewhat of a 'legal hybrid' in that

the stockholder possesses both stock and a lease, and the relationship between the tenant-shareholder and the owner-cooperative is largely determined by reading together the certificate of incorporation, stock offering prospectus, the stock subscription agreement, and the proprietary lease." (*Sanders v. Tropicana* (1976), 31 N.C. App. 276, 281, 229 S.E.2d 304, 307-08.) The primary interest of every stockholder in such a corporation is the long-term propriety lease and the stock is incidental to such purpose and merely affords the practical means of combining an ownership interest with the method of sharing proportionately the assessments for maintenance and taxes. *Penthouse Properties, Inc. v. 1158 Fifth Avenue, Inc.* (1939), 256 App. Div. 685, 11 N.Y.S.2d 417.

In the present case, there is no provision in plaintiff's bylaws or in the "Shareholder's Proprietary Lease" that requires shareholder-tenants to accept issues of stock voted by plaintiff's directors on account of a tenant's construction or improvement of a capital asset. Indeed, a member of plaintiff's accounting firm observed in a letter to plaintiff's secretary-treasurer that, "I have been unable to determine the rationalization for issuing additional shares of Stock when a leaseholder makes an improvement in his property." However, the trial court found that article II, section 1 of the lease afforded plaintiff authority to issue the additional shares to defendant. As pertinent, that section provides:

"[The Lessee hereby covenants to] pay the Lessor *** an annual assessment as rental for said apartment for and during the term of this lease equal to that proportion of the gross amount required by the Lessor during each year for the purposes next mentioned which the number of shares of the capital stock of the Lessor owned by Lessee herein bears to the total number of shares of stock of the Lessor then outstanding, to-wit, one/8290th of the gross amount so required for each share of said stock owned by the Lessee herein; it being understood and agreed that the Board of Directors of the Lessor shall, by resolution adopted at its first meeting after the annual meeting of stockholders, or at any other subsequent meeting, estimate the sum of money which, in its judgment, will be required by the Lessor during the year next ensuing, *** for the maintenance of the corporate existence of the Lessor and the carrying charges on the property of the Lessor, including payment of taxes and assessments, interest on mortgage indebtedness, if any, insurance, cost of repairs and replacements, and the necessary expense of upkeep, maintenance and operation, plus any

deficit in the amount fixed for the preceding year, and levy an assessment therefor; said assessment to be payable, without notice, in equal monthly installments in advance on the first day of each and every month during said year.

\* \* \*

It is further understood and agreed that if any time the Board of Directors shall, by resolution, declare that an emergency exists requiring additional funds not included in the annual estimates above referred to, the said Board may make a supplemental estimate of the sum to be required by the Lessor for the purposes above mentioned for the ensuing year, and levy an assessment therefor, which shall be payable in the proportion hereinbefore specified and in such manner as shall be determined by the Board of Directors. It is further understood and agreed that the right to establish the amounts, and to require the payment of any of the assessments above provided for, shall be possessed only by the Board of Directors of the Lessor, and shall not pass to any receiver or creditor of the Lessor."

Contrary to the conclusion reached by the trial court, this paragraph does not expressly or by implication confer upon the directors the authority to issue additional shares of stock as a method of determining each tenant's maintenance assessment. We rest this conclusion upon the fact that the lease's terms specify a method for making this calculation on the basis of the ratio between each tenant's number of shares and "the total number of shares of stock of the Lessor then outstanding \* \* \*."

While defendant had sought and obtained the directors' prior approval for the construction of the elevator, no provision was made at that time reflecting an agreement whereby defendant would be bound to accept an additional number of shares to be determined by the board. This fact, therefore, belies plaintiff's contention that the parties' conduct amounted to an implied amendment of the proprietary lease requiring defendant to accept additional stock. Moreover, implied amendments of the tenant's lease appear to be contrary to the spirit of article III, paragraph 4 of the lease, which provides for all leases to be uniform in content and requires that changes in the form of leases have written consent from two-thirds of the shareholders.

■■ Inasmuch as we find no provision in the corporate bylaws authorizing plaintiff to impose upon its shareholders the obligation to accept additional stock on account of the shareholders' contributions to the corporation's capital, nor any provision in the proprietary lease which requires shareholders to accept such shares when tendered, we

conclude that there is no basis upon which defendant could have been required to accept shares voted by plaintiff's board of directors. Neither the fact that defendant had voluntarily accepted such shares in the past, or that he was prepared to accept voluntarily a smaller number of shares in the present circumstances will suffice to demonstrate defendant's agreement to the practice for which plaintiff contends.

■ We agree with plaintiff that the trial court's ruling, that plaintiff was authorized to issue additional shares, was inconsistent with its conclusion that the corporation was not entitled to any recovery whatever. We also agree with plaintiff's contention that it is the responsibility of a corporation's directors, in the absence of fraud, conclusively to determine the value of the corporation's no-par stock. However, we conclude that plaintiff lacked the authority to require defendant to accept the additional shares issued by plaintiff's board. Accordingly, the judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

LINDBERG and NASH, JJ., concur.